IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAMEON SHAW,
     Plaintiff,

     v.

STATE OF MARYLAND, et al.,
     Defendants.

Civil Action No. ELH-18-782

**MEMORANDUM OPINION**

This case is rooted in the prosecution of plaintiff Dameon Shaw for two armed robberies that occurred in Baltimore City in 2011. In particular, one occurred on October 2, 2011, at a Price Value Supermarket, and the other occurred on October 11, 2011, at a 7 Eleven store. Shaw was convicted of both offenses following trials in the Circuit Court for Baltimore City. However, in an unreported opinion issued by the Maryland Court of Special Appeals on March 19, 2015, the convictions were reversed. *See Shaw v. State*, No. 2038, Sept. Term 2013 (2015), *cert. denied*, 443 Md. 736 (2015). That court concluded that there was no probable cause for Shaw's arrest.[1]

The appellate ruling spawned this civil rights action, filed by Shaw on March 16, 2018, against the State of Maryland (the "State"); the Baltimore City Police Department ("BPD"); "Baltimore City" (the "City")[2]; BPD Detective Brandon Echevarria; BPD Detective Dexter Nazareno; BPD Detective Theodore Anderson; Price Value Supermarket Corp. (the

_____

[1] Plaintiff asserts that, even after he was "exonerated" by the Court of Special Appeals, "the State continued its appeals." ECF 1, ¶ 54. Therefore, he remained incarcerated until January 20, 2016. *Id.*

[2] The correct name is the Mayor and City Council of Baltimore.

"Supermarket"); Dennis Rosario, a store manager for the Supermarket; as well as Jose Ramon; GC Hollins Ferry Corp. ("GC Hollins"); and Carlos Cruz, who are owners and/or operators of the Supermarket. ECF 1 (the "Complaint").[3] Eschevarria, Nazareno, and Anderson (collectively, the "Officer Defendants") were sued in their personal and official capacities. *Id.* ¶ 4.

The Complaint contains seven counts, each lodged against all defendants. Plaintiff seeks damages, injunctive relief, attorneys' fees, and costs. *Id.* at 16.

Count One, titled "Federal Civil Rights Violation," is founded on "Title 42 U.S.C. [§§] 1983 and 1988; and by Title U.S.C. 245" [sic], and asserts violations of the Fourth, Fifth, and Fourteenth Amendments. *Id.* ¶¶ 64-75.[4] In particular, plaintiff alleges that defendants' "wrongful conduct consists" of the following: "police misconduct, police brutality, false arrest, false imprisonment, improper supervision, use of unreasonable force, failure to take appropriate and reasonable steps which would reasonably have prevented the need to use force in the first place, failure to adequately assess the need to use force, failure to adequately assess the need for self-defense, and failure to carry out proper police procedure and protocol[.]" *Id.* ¶ 67.

Count Two, titled "Maryland Civil Rights," asserts violations of Articles 2, 19, 24, and 26 of the Maryland Declaration of Rights. *Id.* ¶¶ 76-89. Count Three, titled "Negligence," alleges "wrongful harm" to plaintiff from October 12, 2011, to January 2016, when he was released from incarceration. *Id.* ¶¶ 90-95. Count Four asserts a claim for "Negligent Hiring and Training." *Id.*

---

[3] On August 20, 2018, plaintiff effected service on "Price Value Supermarket Corp.," Cruz, and GC Hollins. ECF 19; ECF 20; ECF 21; ECF 34. Pursuant to Fed. R. Civ. P. 12(a)(1)(A)(i), a defendant must respond to a complaint within 21 days of service of the suit. As of this date, no responsive pleading to the Complaint has been filed by Cruz, GC Hollins, or the Supermarket. *See* Docket.

[4] Two paragraphs are labeled as paragraph 64.

¶¶ 96-102.  Count Five alleges "Intentional Infliction of Emotional Distress."  *Id.* ¶¶ 103-107.  In Count Six, plaintiff seeks recovery for "False Imprisonment and Arrest."  *Id.* ¶¶ 108-110.  And, Count Seven asserts a "Malicious Prosecution" claim.  *Id.* ¶¶ 111-115.

Four motions to dismiss are now pending.  The Officer Defendants have moved to dismiss the Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6) (ECF 40), supported by a memorandum of law.  ECF 40-2 (collectively, "Officer Motion").  The BPD also moved to dismiss under Fed. R. Civ. P. 12(b)(6) (ECF 41), supported by a memorandum.  ECF 41-1 (collectively, "BPD Motion"). The City has moved to dismiss under Fed. R. Civ. P. 12(b)(6) (ECF 42), supported by a memorandum of law.  ECF 42-1 (collectively, "City Motion").  And, the State has moved to dismiss (ECF 43) under Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction, and under Fed. R. Civ. P. 12(b)(6).  It is supported by a memorandum of law.  ECF 43-1 (collectively, "State Motion").

Plaintiff opposes the motions (ECF 50; ECF 51; ECF 52; ECF 53), and defendants have replied.  ECF 54 (State); ECF 55 (City); ECF 56 (Officers); ECF 57 (BPD).

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Officer Motion (ECF 40), the BPD Motion (ECF 41), the City Motion (ECF 42), and the State Motion (ECF 43).

## I.        Factual Background[5]

---

[5] Given the procedural posture of this case, I must assume the truth of all factual allegations in the Complaint.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

At the relevant time, plaintiff was a "26-year-old man with a dark complexion approximately 5'7 and 140 pounds." ECF 1, ¶ 3. Echevarria, Nazareno, and Anderson "were employed as police officers/detectives" for BPD. *Id*. ¶ 4.

On October 2, 2011, the Supermarket, located on East Monument Street in Baltimore City, "was robbed at gunpoint by a man wearing a gray and black hooded sweatshirt[.]" *Id*. ¶ 18. Echevarria, who was assigned to the BPD's Robbery Unit, "responded to the store on October 4, 2011 and viewed a surveillance tape of the robbery[.]" *Id*. ¶ 19.

According to the Complaint, the surveillance footage from the day of the armed robbery showed a male suspect wearing a black mask and a light-colored glove, with red on the inside, on his right hand. *Id*. ¶¶ 25-27. The suspect brandished a gun in his right hand, approached the cashier in the store and fled the scene after he obtained money. *Id*. ¶¶ 25, 28.

Then, on October 11, 2011, a man wearing a black jacket, a mask, and a glove on his right hand entered the 7 Eleven store, located at 6001 Harford Road in Baltimore, and robbed the store at gunpoint. *Id*. ¶¶ 43, 45. The cashier of the 7 Eleven emptied the money into a black plastic bag, which the man carried in his left hand. *Id*. ¶¶ 45-46.

Plaintiff alleges that Echevarria and Anderson "conferred and determined the Price Value Supermarket and 7 Eleven Robbery had similar characteristics." *Id*. ¶ 47. Echevarria "prepared a[nd] distributed a wanted flyer based on a still image obtained from the 7 Eleven store's surveillance camera" and used "this description as the man who committed the Price Value Supermarket robbery as well"[.] *Id*. ¶ 48.

Nazareno was advised by a City Watch camera operator on October 11, 2011,[6] that a person who matched the description of the individual who robbed the Supermarket "was walking near the 2400 Block of Monument Street, Baltimore City, Maryland." *Id.* ¶ 21. In particular, Nazareno was advised that the individual was a "black male" who was "5'8, 180 pounds [and] light skinned," and "wearing a black and gray sweatshirt.'" *Id.* ¶¶ 21, 22.

With his gun drawn, Nazareno approached Shaw in the 2400 Block of East Monument Street and questioned him for approximately five minutes. *Id.* ¶ 23. According to the Complaint, Nazareno detained Shaw "solely for walking while black in a neighborhood under heavy police surveillance." *Id.* ¶ 20. Shortly after Shaw was detained, Nazareno transported him to the BPD's Robbery Unit, where he "turned the Plaintiff over" to Echevarria. *Id.* ¶ 24.

Following Shaw's arrest, Rosario, a Supermarket employee, watched the surveillance video of the robbery. *Id.* ¶¶ 29, 39. Rosario confirmed that the camera in the store "does not take pictures of the faces of individuals detected by the surveillance cameras[.]" *Id.* ¶ 40. Plaintiff also alleges that Rosario "never gave a description of the robber to the police" on October 2, 2011, "was never interviewed at Police Headquarters", and "did not have the name of a suspect in mind" before plaintiff was arrested. *Id.* ¶¶ 31-33.

Rosario identified plaintiff in a photo array prepared by Echevarria, stating that plaintiff "'looked familiar.'" *Id.* ¶¶ 29-30, 34, 38. But, plaintiff maintains that the photo array prepared by Echevarria was "suggestive and designed to encourage" Rosario to identify plaintiff as the robber.

---

[6] According to the Complaint, Nazareno detained plaintiff on October 11, 2011. However, as discussed below, the Maryland Court of Special Appeals states that Shaw was detained on October 12, 2011. *See Shaw v. State*, No. 2038, Sept. Term 2013 (Mar. 19, 2015), ECF 1 at 21. The discrepancy is not material.

*Id.* ¶ 35. According to plaintiff, Rosario knew that "Shaw did not fit the description of the robber." *Id.* ¶ 37.

The Circuit Court for Baltimore City heard motions to suppress. At the hearing, Echevarria testified that Rosario described the suspect as "a light completed [sic] man weighing approximately 180 pounds." *Id.* The defense motions were denied, and the case concerning the Supermarket robbery proceeded to a jury trial. Shaw "was convicted of the armed robbery" and related charges. *Id.* ¶ 41. He "was sentenced to 30 years in prison, the first 5 years without the possibility of parole[.]" *Id.*

Thereafter, Shaw elected a bench trial in the Circuit Court for Baltimore City with respect to the 7 Eleven robbery. Echevarria and Anderson testified that the surveillance video on the date of the armed robbery "depicted an African American male enter the store with a glove on his right hand, holding a semiautomatic handgun[.]" *Id.* ¶ 44. Shaw was convicted of the 7 Eleven robbery and sentenced to a concurrent term of 30 years in prison, the first five years without parole. *Id.* ¶ 51.

Following plaintiff's convictions, he timely appealed to the Maryland Court of Special Appeals. *Id.* ¶ 52. On March 19, 2015, in an unpublished opinion, the Maryland Court of Special Appeals reversed plaintiff's convictions. *Shaw v. State*, No. 2038, Sept. Term 2013 (Mar. 19, 2015), *cert. denied*, 443 Md. 736 (2015); ECF 1 at 17-42.[7]

The opinion, on which Shaw relies, includes several noteworthy facts that plaintiff omitted from the Complaint.

---

[7] Plaintiff attached a copy of the opinion to the Complaint. I may also take judicial notice of the decision as a matter of public record. *See, e.g., Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("Courts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment.").

For example, a video from the Supermarket, recorded two hours prior to the robbery, captured a person with the same "distinctive hooded sweatshirt" as the robber, with his face uncovered, wearing "a doo-Rag . . . ." ECF 1 at 21. On October 12, 2011, when appellant was apprehended, he was wearing the same black and gray hooded sweatshirt as seen in the video. *Id.* And, a black doo-rag was found in his possession. *Id.* In addition, during the robbery of the Supermarket, the assailant wore a "'ninja' type mask with just his eyes exposed, and one glove on his right hand, in which he held the handgun." *Id.* at 20.

The second robbery occurred on the evening of October 11, 2011, with the assailant wearing a mask and a black jacket. *Id.* at 22. The robber wore one glove on his right hand, which he used to brandish the gun. *Id.*

Detective Anderson testified that when Shaw was arrested, he was wearing the same clothing worn by the robber. *Id.* at 23. In particular, at the time of the seizure of Shaw, "he was *wearing* a distinctive black hooded sweatshirt, a black doo-rag, bandanna and one right-handed beige-colored glove . . . ." *Id.* at 24 (emphasis added). Moreover, when Shaw was apprehended, he was in possession of a ski mask with the eyes cut out and one right-handed glove. *Id.* at 21.

On appeal to the Maryland Court of Special Appeals, Shaw presented two questions, ECF 1 at 18:

1. Did the lower court err in concluding that Mr. Shaw was lawfully seized, upon suspicion that he had committed a robbery in a nearby location ten days earlier, when the only description provided to the seizing officer was that the suspect was a black male, wearing a black and grey sweater?

2. Did the lower court err, at Mr. Shaw's second trial, in permitting the State to introduce evidence of other criminal acts allegedly committed by Mr. Shaw to show the perpetrator's identity where there was an insufficient degree of similarity between the offenses?

As to the first question, Shaw contended that "there was no reasonable articulable suspicion or probable cause to support the stop and the subsequent transport of [Shaw] to the police station, and that the court's findings in denying the motion were clearly erroneous." *Id*. at 31. The Maryland Court of Special Appeals disagreed. It concluded that Shaw's initial detention was supported by reasonable articulable suspicion. *Id*. at 35.

The court reasoned, *id*. at 35-36:

Detective Eschevarria's investigation included viewing the surveillance video of incidents occurring before and during the robbery of the Price Value Supermarket. The video showed an individual wearing a distinctive jacket entering the store and standing in the lottery line an hour before the robbery, and a person matching that description committing the robbery about an hour later. The wanted flyer, at minimum, was based on reasonable articulable suspicion that this individual was involved in the completed felony, and it was reasonable for police, in reliance on the information in the wanted flyer, to briefly stop a person matching this description for purposes of further investigation.

                    *        *        *

In this case, Detective Eschevarria prepared the wanted flyer based on images from the surveillance video, including the distinctive hooded gray and black sweater the suspect was seen wearing. That information was, in turn, transmitted to the CitiWatch camera operators. A camera operator, relying on that flyer, then observed a man matching the description in the flyer and contacted a patrol officer, Officer Nazareno. The camera operator informed the patrol officer to detain the person matching the description in the flyer. After that person was detained, the patrol officer confirmed with the camera operator that he had detained the intended person. We are persuaded that the court's findings were not clearly erroneous under these circumstances.

The court also determined that Shaw "was under arrest when he was handcuffed and transported from to [sic] the Robbery Unit for further investigative purposes by Detective Echevarria." *Id*. at 39. It explained, *id*.:

Although it may have been reasonable to conclude that, in connection with this armed robbery investigation, that [Shaw] may have been armed and dangerous, and that the use of handcuffs were reasonable in connection with what clearly began as a *Terry* [*v. Ohio*, 367 U.S. 643, 655 (1961)] stop, *see Cross v. State*, 165 Md. App. 164, 178-89 (2005) ("[T]he mere fact that a suspect has been handcuffed does not

necessarily mean that he or she has been arrested"), we conclude that restraining appellant's movement and transporting him away from the scene of the initial detention to the police station constituted an arrest. *See United States v. Hensley*, 469 U.S. [221, 235 (1985)] (observing that the initial purpose of an investigative stop may exceed the legitimate purposes of a *Terry* stop).

Of relevance here, the Maryland Court of Special Appeals determined that Shaw's arrest was not supported by probable cause. *Id*. at 41. It stated, *id*.:

> In the case before us, the State's most persuasive argument is that, when [Shaw] was arrested, ten days after the robbery of the supermarket in a densely populated area of Baltimore City, he was wearing a distinctive gray and black hooded sweater. However, there were discrepancies between the description of the complexion and weight of the person seen in the surveillance video and appellant. Although we are persuaded that the State established a sufficient basis to support a *Terry* stop based on reasonable articulable suspicion, under the circumstances of this case, probable cause to arrest [Shaw] for the robbery that took place ten days earlier was not extant. Viewed in a light most favorable to the State, we are unable to hold that probable cause was established based on the fact that [Shaw] was an African-American male wearing a similar sweatshirt to that worn by the suspect seen in the store surveillance video. *See Bailey v. State*, 412 Md. 349, 374-75 (2010) ("A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion"). . . . Under the facts of this case, we are not persuaded that there was probable cause to arrest [Shaw] and then transport him, in handcuffs, for further investigation.

The court concluded that "[b]ecause [Shaw] was arrested without probable cause, the fruits of his unlawful arrest should have been suppressed by the motions court." *Id*. at 42. Accordingly, it reversed the judgments in both criminal cases. *Id*.

The Complaint asserts that defendants "acted in concert to manufacture an eyewitness identification, despite the fact that Defendants knew and should have known that the [plaintiff] did not fit the description," and that defendants "knew and should have known [that] plaintiff did not commit either the armed robbery at 7 Eleven or Price Value Supermarket[.]" *Id*. ¶¶ 59, 60. Further, Shaw maintains that Echevarria, Anderson, and Rosario "conspired" to "frame" plaintiff for the Supermarket and 7 Eleven robberies "on account of his race." *Id*. ¶¶ 49, 50. In addition, Shaw alleges that defendants "continued to prosecute and pursue [plaintiff] for these crimes," despite

9

"acknowledging that the armed robber was light skinned" and knowing that plaintiff was "innocent." *Id.* ¶ 61. According to Shaw, he "was targeted because of his race by the Defendants, seeking to convict him for a crime the Defendants knew and should have known he did not commit[.]" *Id.* ¶ 63.

Additional facts are included, *infra*.

## II.      Legal Standards

All defendants move to dismiss the Complaint, pursuant to Rule 12(b)(6), for failure to state a claim. ECF 40; ECF 41; ECF 42; ECF 43. In addition, the State moves to dismiss under Rule 12(b)(1), for lack of subject matter jurisdiction. ECF 43.

### A.      Rule 12(b)(1)

A challenge to a federal court's subject matter jurisdiction is reviewed pursuant to Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

A test of subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quotation marks and citation omitted); *accord Durden*, 736 F.3d at 300.

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see also Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.

1997). In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192. In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

With respect to the State's contention that plaintiff's claims are barred by Eleventh Amendment immunity, the State seems to raise a facial challenge. Therefore, I shall assume the truth of plaintiff's allegations.

### B.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts

sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.'*" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor and City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they

are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

### III.    Discussion

As indicated, Count One is lodged under "Title 42 U.S.C. § 1983 and 1988; and . . . Title U.S.C. 245 [sic]." ECF 1, ¶ 72. In Count One, plaintiff asserts violations of the Fourth, Fifth, and Fourteenth Amendments. In Counts Two through Seven, he asserts claims under Maryland law. ECF 1, ¶¶ 64-115.

### A.  Section 1988; "Title U.S.C. 245"

Section 1988 of 42 U.S.C. provides, in pertinent part: "In any action or proceeding to enforce a provision of section[] . . . 1983 . . of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." Section 1988 is a fee-shifting provision, and does not create an independent cause of action. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 701 n.66 (1978); *Moor v. Alameda Cty.*, 411 U.S. 693, 703-04 (1973).

And, "Title U.S.C. 245" appears to reference 18 U.S.C. § 245, a criminal statute that affords no private right of action. *See Hussain v. Hosking*, 15-13285-FDS, 2016 WL 696095, at *3 (D. Mass. Feb. 19, 2016) ("18 U.S.C. § 245(b)(2) is a criminal statute and provides no right of action for private parties."); *People ex rel. Snead v. Kirkland*, 462 F. Supp. 914, 920 (E.D. Pa. 1978) ("Section 245(b)(1) permits federal prosecution for interference with a long list of federally protected activities; it confers neither substantive rights nor a private right of action for damages.").

Accordingly, there is no basis for suit under § 1988 or "Title U.S.C. 245." Therefore, as to Count One, I shall limit my discussion to § 1983.

## B. Section 1983 Generally

Section 1983 of 42 U.S.C. provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1893 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). Notably, "[t]he first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982)). A person acts under color of state

law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient." (Citations and internal quotation marks omitted)).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an

affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

Plaintiff has set forth no facts whatsoever suggesting that the Supermarket, Rosario, GC Hollins, or Cruz were acting under color of law. Therefore, there is no basis for a § 1983 claim against them.

### C.    The State Motion

All seven counts are lodged against the State. ECF 1, ¶¶ 64 -115. Only Count One is based on federal law.

The State contends, *inter alia*, that plaintiff's claims are barred in their entirety by the Eleventh Amendment to the Constitution. ECF 43-1 at 3-10. Plaintiff counters that the "State has waived its immunity in this proceeding," pursuant to the Maryland Tort Claims Act ("MTCA"), Md. Code (2014 Repl. Vol., 2018 Supp.), §§ 12–101 *et seq.* of the State Government Article ("S.G.").

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State."

Under the Eleventh Amendment, states generally enjoy immunity from suits brought in federal court by their own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). Therefore, absent consent or a valid congressional abrogation of sovereign immunity, the Eleventh Amendment bars a private individual from bringing suit against a state in federal court

to recover damages, unless there is an exception to sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).[8]

The Eleventh Amendment did not create sovereign immunity. Rather, it preserves the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). State sovereign immunity "accord[s] states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

The Fourth Circuit recently reiterated that the defense of sovereign immunity is a jurisdictional bar. It said that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). But, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

---

[8] State sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions." *Passaro v. Va.*, ___ F.3d ___, 2019 WL 3849555, at *3 (4th Cir. Aug. 16, 2019) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n.14 (1996)).

Of relevance here, state sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," including state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019) *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

The Fourth Circuit has noted three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).

None of the exceptions is applicable here.

Congress has the power to abrogate a state's sovereign immunity, but must do so pursuant to a valid grant of constitutional authority. *Garrett*, 531 U.S. at 363; *Lee-Thomas*, 666 F.3d at 249. This exception is inapplicable because the Supreme Court has made clear that Congress did not intend to abrogate a state's Eleventh Amendment immunity under § 1983. *See Quern v. Jordan*, 440 U.S. 332, 341 (1979). In *Quern*, 440 U.S. at 345, the Supreme Court concluded that suits by individuals against a state for money damages under § 1983 are barred by the Eleventh

Amendment. *Id.* ("[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]").

Plaintiff seeks injunctive relief. In particular, he asks the Court "to enjoin Defendants from any further or similar unlawful or unconstitutional acts as were committed against Plaintiffs [sic] . . . ." ECF 1 at 16. But, this exception is not applicable "because the complaint does not name as defendants any officials of the State of Maryland." *Lee-Thomas*, 666 F.3d at 249. *See, e.g.*, *Edelman*, 415 U.S. at 676; *Ex Parte Young*, 209 U.S. 123 (1908); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997) (recognizing exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against state officers in their individual capacities).

Third, as to waiver, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 939 F.3d at 101. Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

Although a state may waive its Eleventh Amendment sovereign immunity and permit suit in federal court, *see Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *Lee-Thomas*, 666 F.3d at 249, Maryland has not waived its Eleventh Amendment immunity to a suit of this kind in federal court.

Plaintiff contends otherwise. He argues that the "State has waived its immunity in this proceeding" (ECF 51 at 2) based on the MTCA, §§ S.G. 12–101 *et seq.*

The MTCA offers "a limited waiver of sovereign immunity" and is "the sole means by which the State of Maryland may be sued in tort." *Swagler v. Harford Cty.,* RDB-08-2289, 2009 WL 1575326, at *4 (D. Md. June 2, 2009), *aff'd in part, rev'd in part on other grounds sub nom. Swagler v. Neighoff,* 398 F. App'x 872 (4th Cir. 2010) (per curiam); *see Condon v. Md.-Univ. of Md.*, 332 Md. 481, 492, 632 A.2d 753, 758 (1993); *Mitchell v. Housing Auth. of Baltimore City*, 200 Md. App. 176, 201–202, 26 A.3d 1012, 1027–28 (2011). However, "the immunity of the State and of its units is waived as to a tort action, *in a court of the State*," provided that the State's liability may not exceed $200,000. S.G. § 12–104 (emphasis added). Moreover, S.G. § 12–103(2) provides that under the MTCA, Maryland does not "waive any right or defense of the State or its units, officials, or employees in an action *in a court of the United States* or any other state, including any defense that is available under the 11th Amendment to the United States Constitution." (Emphasis added.)

Plaintiff's argument is unavailing. The Fourth Circuit has explained, *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 397–98 (4th Cir. 1990) (citation omitted) (emphasis added): "The waiver of sovereign immunity in the Maryland Torts [sic] Claims Act clearly limits the state's waiver of immunity to actions brought in the Maryland state courts.... A state's waiver of immunity from suit *in state court* 'is not enough to waive the immunity guaranteed by the Eleventh Amendment.'"

As such, plaintiff's claims against the State are subject to dismissal, without prejudice, based on sovereign immunity.

### D.    The City Motion

The City moves to dismiss all claims asserted against it on the ground that it "does not control BPD or its employees." ECF 42-1 at 6. Specifically, it asserts, *id.*: "Nothing in the Complaint can state a legally viable claim against the City – neither vicariously nor directly – because the individual defendants are not agents of the City and the City has no legal role in setting BPD policy regarding training or otherwise."

Plaintiff disagrees. In his skeletal, two-page opposition, he contends that he "has laid out a prima facie case to hold the City of Baltimore accountable under federal and state law." ECF 52 at 1.

Presumably, based on the allegations in the suit, plaintiff's § 1983 claim against the City is founded on respondeat superior liability for the actions of the BPD officers. However, in order to establish respondeat superior liability, the City "must have an agency or employment relationship with the alleged wrongdoer." *Fish v. Mayor and City Council of Balt.*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018). at *3. Under Maryland law, however, the BPD is an agency of the State, not the City. *Id.* at *2 (citing PUB. LOCAL LAWS OF MD., Art. 4 § 16-2(a) (2014) ("The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland.")); *see also Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128 (2008) (observing that "the Baltimore Police Department is not an agency of the City of Baltimore and has not been for some time").

Indeed, under Maryland law, the BPD has been a State agency, not a local agency, since 1867. *See Clark*, 404 Md. at 23, 944 A.2d at 1128; *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 669-70, 541 A.2d 1303, 1306-07 (1988). And, BPD officers are generally considered State employees. *See Burgess v. Balt. Police Department*, RDB-15-0834, 2016 WL 795975, at *6

(D. Md. March 1, 2016). Moreover, the City does not implement policy for the BPD. *See* BALT. CITY CHARTER, Art II, § 27 ("[N]o ordinance of the City or Act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."); *Balt. Police Dept v. Cherkes*, 140 Md. App. 283, 312, 780 A.2d 410, 427–28 (2001).

In sum, "the City does not sufficiently control the BPD to be responsible for Baltimore police officer conduct under § 1983 (*i.e.*, they are not City employees)." *Estate of Anderson v. Strohman*, 6 F. Supp. 3d 639, 644 (D. Md. 2014). As Judge Blake said in *Fish*, 2018 WL 348111, at *3: "This court repeatedly has found the City is not responsible for officer conduct under § 1983 because BPD officers are not employees of the City as a matter of law." *See also Bradley v. Balt. Police Dep't*, 887 F. Supp. 642, 646-48 (D. Md. 2012) (dismissing § 1983 suit against the City because it "does not exert sufficient control over the BPD to be subject to liability for the latter's actions"). Therefore, plaintiff's § 1983 claim against the City is subject to dismissal.

### E.     The BPD Motion

In Count One, plaintiff alleges under § 1983 that the BPD "is being sued because it negligently hired and negligently, separately and individually, trained the Defendant Police Officers." ECF 1, ¶ 71. And, in Counts Two through Seven, plaintiff asserts various State law claims against the BPD.

The BPD moves to dismiss plaintiff's claims on several grounds. ECF 41-2. First, BPD contends that it possesses sovereign immunity from suit as a State agency. *Id*. at 4. Second, BPD argues that plaintiff's claims are time-barred based on the face of the Complaint. *Id*. Third, it asserts that Counts One, Two, and Seven are inadequately pleaded. *Id*.

As to Count One, BPD argues that it "cannot be held liable under *respondeat superior* under § 1983." *Id.* at 5. With respect to Counts Two through Seven, BPD argues that its "status

as a state agency provides it sovereign immunity from Plaintiff's state law claims." *Id.* at 4 (citing *Estate of Anderson*, 6 F. Supp. 3d at 642).

As discussed, State agencies enjoy immunity from suit brought in federal court. *See Hans*, 134 U.S. at 3; *see also Garrett*, 531 U.S. at 363; *Bd. of Educ. of Prince George's Cty. v. Town of Riverdale*, 320 Md. 384, 389, 578 A.2d 207, 210 (1990). However, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)). Sovereign immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195-96 (4th Cir. 2016) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (internal quotations omitted).

As noted, in connection with a suit against the City under § 1983, based on respondeat superior liability with respect to the BPD, the BPD is considered a State agency. But, the question here is whether a plaintiff may sue the BPD itself pursuant to § 1983.

To determine whether an entity is sufficiently connected to a state for purposes of immunity, the Fourth Circuit has articulated a nonexclusive list of four factors to be considered: (1) whether the state will pay any judgment against the defendant entity; (2) "'whether the entity exercises a significant degree of autonomy from the state,'" (3) "'whether [the entity] is involved with local versus statewide concerns,'" and (4) "'how [the entity] is treated as a matter of state

law.'" *Lane*, 660 F. App'x at 195 (alterations in original) (some alterations omitted) (quoting *Ram Ditta*, 822 F.2d at 457-58).

On this issue, *Chin v. City of Baltimore*, 241 F. Supp. 2d 546 (D. Md. 2003), is informative. The case arose from an encounter between plaintiff Michael Chin and BPD police officers. *Id.* at 547. Several BPD police officers, led by Officer Wilhelm, entered a store owned by Chin, with their weapons drawn. *Id.* The officers searched the premises without a warrant and "displayed no indicia that they were affiliated with law enforcement." *Id.* They subsequently assaulted Chin and "then handcuffed him for an extended period of time." *Id.* The search did not produce any contraband and, as a result of the search, the store sustained significant property damage. *Id.* Thereafter, Chin filed suit against Officer Wilhelm, the BPD, and the City of Baltimore, pursuant to 42 U.S.C. § 1983, for federal civil rights violations and for State common law and constitutional torts. *Id.*

Judge Blake considered, *inter alia*, "whether the Baltimore Police Department is a state agency for Eleventh Amendment purposes" and therefore entitled to Eleventh Amendment immunity. *Id.* at 548. In connection with the plaintiffs' § 1983 claims, Judge Blake determined that the BPD is "too interconnected with the government of the City" so as to constitute a State agency. *Id.* Therefore, it is a "person" subject to suit under § 1983. *Id.*

To my knowledge, the Fourth Circuit has not directly addressed this issue. In *Wiley v. Mayor and City Council of Baltimore*, 48 F.3d 773 (4th Cir. 1996), the Court assumed that in a § 1983 action, the BPD "may be held accountable . . . ." *Id.* at 776. And, numerous decisions in this District have repeatedly said that the BPD is not entitled to Eleventh Amendment immunity

in regard to a claim against it under § 1983.  *See, e.g., Lucero v. Early*, GLR-13-1036, 2018 WL

4333745, at *6-9 (D. Md. Sept. 11, 2018); *Fish*, 2018 WL 348111, at *3.

Significantly, as to the claims lodged under Maryland law, the *Chin* Court considered the

BPD an arm of the State and, based on sovereign immunity, dismissed the State law claims against

it.  The *Chin* Court explained, *id.* at 548-49:

> However, with respect to the state law causes of action, the result is
> different.  State sovereign immunity "protects the State not only from damage
> actions for ordinary torts but also from such actions for State constitutional torts."
> *Cherkes*, 780 A.2d at 424.[ ]  The Baltimore Police Department enjoys sovereign
> immunity from actions for damages based on state common law torts or state
> constitutional torts.  *See id.* at 422; 436.[ ]  The claims against the Baltimore Police
> Department based on state law will, therefore, be dismissed on sovereign immunity
> grounds.

Accordingly, for the reasons articulated in *Chin*, plaintiff's § 1983 claim against BPD

(Count One) is not subject to dismissal based on sovereign immunity.

Nevertheless, as to plaintiff's § 1983 claim in Count One, BPD correctly argues that a

municipality cannot be held liable in a § 1983 action under a theory of respondeat superior.  *Monell*

*v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 693–94 (1978).  But, it seems that

plaintiff does not rely on a theory of vicarious liability.  Rather, he alleges a claim of inadequate

training, asserting that "BPD negligently hired and negligently, separately and individually, trained

the Defendant Police Officers."  ECF 1, ¶ 71.  Although not entirely clear from the Complaint, it

appears that plaintiff seeks to assert a claim under *Monell*, alleging negligent supervision and

training.

In *Monell*, 436 U.S. 658, the Supreme Court determined that local governmental bodies

may be liable under § 1983 based on the unconstitutional actions of individual defendants, but

only if those defendants were executing an official policy or custom of the local government that

resulted in a violation of the plaintiff's rights.  *Id.* at 690–91. The Court said that, "when execution

of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Love–Lane*, 355 F.3d at 782. But, as discussed, *infra*, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original).

A viable § 1983 *Monell* claim contains two elements: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional "policy or custom" caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403–04.

"An official policy often refers to 'formal rules or understandings ... that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir.1999) (alteration in *Semple* and citations omitted). "In addition, the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances."

*Id.* "Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003).

A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987); *see Holloman v. Markowski*, 661 Fed. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, 137 S. Ct. 1342 (2017). In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that, to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must ... adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately

caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton, supra*, 489 U.S. at 389).

As indicated, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693–94. Rather, "[l]iability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan*, 743 F.2d at 229 (citing *Monell*, 436 U.S. at 694). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is ... the 'moving force' behind the particular constitutional violation." *Spell*, 824 F.2d at 1387 (internal citations omitted); *see Moore v. Howard County Police Dep't*, No. CCB–10–1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

In *Connick v. Thompson*, 563 U.S. 51 (2011), the Supreme Court explained, *id.* at 60 (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665–683 [ ] ). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691[ ]; *Canton*, 489 U.S. at 392[ ]; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (collecting cases).

In *Canton*, 489 U.S. at 389, the Supreme Court said that "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants ... such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983." Indeed, the manner in which a police force chooses to train its officers is "necessarily a matter of 'policy'. . . ." *Spell*, 824 F.2d at 1389. Therefore, "the inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388.

When a plaintiff asserts a claim based on inadequate training, the "complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training." *Lewis v. Simms*, AW–11–CV–2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, WDQ–09–2340, 2010 WL 93268, *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014). The *Connick* Court observed, 563 U.S. at 61: "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." (Alteration in *Connick*); *see also Canton*, 489 U.S. at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389.

In *Peters v. City of Mount Rainier*, GJH–14–00955, 2014 WL 4855032 (D. Md. Sept. 29, 2014), the plaintiff lodged a § 1983 claim for failure to train the police force. *Id.* at *5. The complaint stated, *id.* (alteration in *Peters*) (quoting the complaint):

> [T]he City maintained an "official policy" of ... "fail[ing] to properly train and supervise its officers; fail[ing] to implement effective procedures for investigating allegations of police misconduct; fail[ing] to discipline officers who violate the Constitutional rights of private citizens through false arrests, malicious prosecutions, and brutal conduct; and generally fail [ing] to provide safeguards against Constitutional abuses by its overzealous officers."

In considering whether to dismiss the failure to train claim, Judge Hazel highlighted the complaint's failure to allege facts concerning the "'nature of the training'" or "'that the officer's conduct resulted from said training.'" *Peters*, 2014 WL 4855032, at *5 (quoting *Lewis*, *supra*, 2012 WL 254024, at *1). He noted: "Peters has not even attempted to allege any such facts; instead, he has simply stated in broad, conclusory terms and in a variety of different ways that the City failed to train and supervise its officers." *Id.* (citation to the record omitted). Emphasizing this deficiency, Judge Hazel concluded that the plaintiff's allegation was "nothing more than a bare-bones generalization that a legal element (i.e. the policy[-]or-custom element) is met. Without more, Peters has failed to adequately allege the existence of a policy or custom through the City's purported failure to train its officers." *Id.*

*Hall v. Fabrizio*, JKB–12–754, 2012 WL 2905293 (D. Md. July 13, 2012), is also instructive. There, Judge Bredar dismissed a failure to train claim against the Baltimore Police Department because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker." *Id.* at *2.

Here, plaintiff claims that the defendants "acted negligently, wantonly recklessly, and with deliberate indifference, including failure to properly supervise . . . , [to] protect the Plaintiff's clearly established and then-existing rights[.]" ECF 1, ¶ 70. Further, plaintiff asserts that BPD "is being sued because it negligently hired and negligently, separately and individually, trained the Defendant Police Officers[.]" *Id.* ¶ 71.

However, plaintiff's allegations are woefully inadequate in regard to a § 1983 claim based on inadequate training. The allegations are merely conclusory; plaintiff paints with a broad brush and provides little in the way of any actual facts, other than his claim of an illegal arrest. But, as in *Peters*, 2014 WL 4855032, at *5, plaintiff fails to allege facts concerning the "'nature of the training'" of police officers, or facts showing that the officers' "'conduct resulted from said training.'" Nor does plaintiff allege any facts as to "how that training reflects the decision of any municipal policymaker." *Hall*, 2012 WL 2905293 at *2.

Notably, the Maryland Court of Special Appeals upheld the stop of Shaw as lawful. And, although the appellate court concluded that the officers lacked probable cause for the arrest, this does not equate to a policy of deliberate indifference to Shaw's rights. At worst, the conduct was a mistake in judgment as to the sufficiency of facts on which to base probable cause. Indeed, the concept of probable cause belies the assertion that the arrest was the product of a policy of inadequate training.[9]

The assessment of probable cause is based on the totality of the relevant circumstances, "rather than on the technical or rigid demands of a formulaic legal test." *United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011). Notably, "officers may draw conclusions from their experience, judgment, and observations . . . ." *United States v. Wienke*, 733 F.3d. App'x 65, 69-70 (4th Cir. 2018).

With respect to probable cause for an arrest, it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. at

---

[9] Some might consider that the underlying arrest of Shaw was the product of good police work. Still others might disagree with the decision of the Court of Special Appeals, and conclude that there was probable cause for Shaw's arrest. Whether the Court of Special Appeals was legally correct is not an issue that has been raised here.

243-44, n.13 (1983); *see also District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 586

(2018).  As to an arrest, "Probable cause is a flexible standard that simply requires 'a reasonable

ground for belief of guilt' and 'more than bare suspicion.'"  *United States v. Ortiz*, 669 F.3d 439,

444 (4th Cir. 2011) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

The concept of probable cause "defies a precise definition[.]"  *United States v. Richardson*,

607 F.3d 357, 369 (4th Cir. 2010).  It is a fluid concept, not a formulaic legal test, and it is "not

readily, or even usefully, reduced to a real set of legal rules.  *Illinois v. Gates*, 462 U.S. 213, 232

(1983); *see United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019); *Allen*, 631 F.3d at 172.

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reiterated, *id.* at 370-71 (citations

and internal quotation marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals
> with the factual and practical considerations of everyday life on which reasonable
> and prudent men, not legal technicians, act.  Probable cause is a fluid [pg. 371]
> concept—turning on the assessment of probabilities in particular factual contexts—
> not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or
> quantification into percentages because it deals with probabilities and depends on
> the totality of the circumstances.  We have stated, however, that [t]he substance of
> all the definitions of probable cause is a reasonable ground for belief of guilt, and
> that the belief of guilt must be particularized with respect to the person to be
> searched or seized[.]

*See also Wesby*, 138 S. Ct. at 586; *Gates*, 462 U.S. at 239; *Brinegar*, 338 U.S. at 175-76.

The totality of circumstances analysis requires a reviewing court to consider "'the whole

picture.'"  *Wesby*, 138 S. Ct. at 588 (citation omitted).  And, "the whole is often greater than the

sum of its parts – especially when the parts are viewed in isolation."  *Id.*; *see also United States v.

Arvizu*, 534 U.S. 266, 277-78 (2002).  "The totality-of-the-circumstances test 'precludes this sort

of divide-and-conquer analysis.'"  *Wesby*, 138 S. Ct. at 588 (quoting *Arvizu*, 534 U.S. at 274);

*accord Drummond*, 925 F.3d at 687.

As I see it, the reversal of Shaw's convictions does not equate to facts that show a custom or policy of poor training of the BPD Officers.

## F.      The Officer Motion

The Officer Defendants have moved to dismiss plaintiff's claims against them on several grounds. First, they contend that, based on the face of the Complaint, Counts One through Six are time-barred. ECF 40-2 at 2. Second, they argue that Counts Two through Seven are barred under the Local Government Tort Claims Act ("LGTCA"), Md. Code (2013 Repl. Vol, 2018 Supp.), §§ 5–301 *et seq*. of the Courts & Judicial Proceedings Article ("C.J."). Third, the Officer Defendants assert that they are entitled to qualified immunity as to plaintiff's § 1983 claims. *Id.* Finally, they argue that plaintiff's State law claims have not been adequately pleaded. *Id.*

### 1.      Statute of Limitations - Section 1983 (Count One)

The Officer Defendants assert that Count One, which alleges constitutional violations under § 1983, "is barred because it has been brought outside the applicable statute of limitations." ECF 40-2 at 9. In particular, Count One asserts violations of the Fourth, Fifth, and Fourteenth Amendments. ECF 1, ¶¶ 64-75. In response, plaintiff contends, ECF 53 at 2: "The applicable statute of Limitations [sic] date in this matter is January 20, 2016, the date the [sic] Mr. Shaw was released from prison; Mr. Shaw's claims accrued from this date."

Further, plaintiff alleges that defendants' "wrongful conduct consists" of the following: "police misconduct, police brutality, false arrest, false imprisonment, improper supervision, use of unreasonable force, failure to take appropriate and reasonable steps which would reasonably have prevented the need to use force in the first place, failure to adequately assess the need to use force, failure to adequately assess the need for self-defense, and failure to carry out proper police procedure and protocol[.]" *Id.* ¶ 67.

In addition, plaintiff asserts, *id.* ¶ 72:

> Defendants, acting individually and in concert, acted willfully, knowingly, and purposely with specific intent, to deprive the Plaintiff of [his] rights, privileges, and immunities secured to [him] by the Constitution of the United States, including but not limited to, the following: freedom from illegal detention or imprisonment; freedom from unreasonable force; freedom from physical abuse; coercion and intimidation; the right to due process; right to life; the right to liberty; and the right to property.

The Officer Defendants have construed the allegations as claims for false arrest and use of excessive force. ECF 40-2 at 10, 11. False arrest and false imprisonment "overlap." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Plaintiff has not disputed the position of the Officer Defendants. *See* ECF 53. Therefore, I shall construe the claims accordingly.

Section 1983 does not contain a statute of limitations. Thus, to determine whether a § 1983 claim was timely filed, courts look to the statute of limitations from the most analogous state-law cause of action. *Owens*, 767 F.3d at 388; *see also* 42 U.S.C. § 1988(a) ("[I]n all cases where [the laws of the United States] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies ... the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil . . . cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause[.]").

A suit filed pursuant to 42 U.S.C. § 1983 constitutes a personal injury action. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. Md. Code (2013 Repl. Vol., 2018 Supp.), C.J. § 5-101; *see Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131, 31 A.3d 212, 236 (2011).

In Maryland, "Limitations statutes . . . are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy." *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 85, 904 A.2d 511, 526 (2006); *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983). And, "[a]s a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit." *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991).

Although the Maryland statute of limitations applies, the matter of when a cause of action has accrued under § 1983 is a federal question. *Nassim v. Md. House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)); *see also McDonough v. Smith*, ___ U.S. ___, 139 S. Ct. 2149, 2155 (2019); *Wallace*, 549 U.S. at 388. "An accrual analysis begins with identifying 'the specific constitutional right' alleged to have been infringed." *McDonough*, 139 S. Ct. at 2155 (quoting *Manuel v. Joliet*, ___ U.S. ___, 137 S. Ct. 911, 920 (2017)).

The date of accrual occurs "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nassim*, 64 F.3d at 955 (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). However, "the answer is not always so simple." *McDonough*, 139 S. Ct. at 2155. "Where, for example, a particular claim may not realistically be brought while a violation is ongoing, such a claim may accrue at a later date." *Id.*

Although accrual is determined under federal law, Maryland law is largely consistent with federal law. "Recognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an

injury," the so-called discovery rule is used to determine the date of accrual. *See Bank of New York v. Sheff*, 382 Md. 235, 244, 854 A.2d 1269, 1275 (2004); *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000). "The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167, 857 A.2d 1095, 1104 (2004).

Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders, Inc.,* 358 Md. 435, 749 A.2d 796, 801 (2000)), *aff'd*, 495 F. App'x 350 (4th Cir. 2012). Accrual cannot occur until the plaintiff has (or should have) "possession of the critical facts that he has been hurt and who has inflicted the injury." *United States v. Kubrick,* 444 U.S. 111, 122 (1979) (discussing discovery rule in the context of the Federal Tort Claims Act, which contains a statute of limitations requiring notice to the government "within two years after such claim accrues"); *see also Gilbert v. United States*, 720 F.2d 372, 374 (4th Cir. 1983).

Notably, "[t]his standard . . . does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Dual Inc.*, 383 Md. at 167-68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano,* 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *Doe v. Archdiocese of Wash.*, 114 Md. App. 169, 188-89, 689 A.2d 634, 644 (1997)). A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and ... a diligent investigation would have revealed that the plaintiffs were victims of ... the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1104 (quoting

*Pennwalt Corp. v. Nasios*, 314 Md. 433, 448–49, 550 A.2d 1155, 1159 (1988)) (alterations in original). .

Here, the Officer Defendants contend that plaintiff's false arrest claim is time-barred under *Wallace v. Kato*, 549 U.S. 384 (2007). In that case, the Supreme Court addressed the timeliness of the plaintiff's unlawful arrest claim, asserted under § 1983. *Id*. at 388.

On January 17, 1994, the plaintiff, Wallace, was arrested, interrogated, and confessed to murder. *Id*. at 386. Prior to his trial in an Illinois court, Wallace unsuccessfully challenged the admissibility of his confession. *Id*. He was subsequently convicted of murder. *Id*. However, on direct appeal, the Appellate Court of Illinois found that that the "officers had arrested [him] without probable cause, in violation of the Fourth Amendment." *Id*. The case was remanded for a new trial, and prosecutors subsequently dropped the charges against him. *Id*. at 387.

Thereafter, on April 2, 2003, Wallace filed a § 1983 suit in federal court against the City of Chicago and several police officers, seeking damages arising from, *inter alia*, his unlawful arrest. *Id*. The district court and the Seventh Circuit dismissed Wallace's unlawful arrest claim as time-barred, finding that his "cause of action accrued at the time of his arrest, and not when his conviction was later aside." *Id*.

On this issue, the Supreme Court determined that the tort of false imprisonment was the tort most analogous to Wallace's § 1983 false arrest claim. *Id*. at 388. It noted that "a person falsely imprisoned has the right to sue on the first day of his detention." *Id*. at 390 n.3. The Court explained that the tort of false imprisonment does not begin to run when "the State drop[s] the charges against [the defendant]," but rather when "legal process [is] initiated." *Id*. at 390. It reasoned, *id*. at 389, that "a false imprisonment ends once the victim becomes held *pursuant to [legal] process* – when, for example, he is bound over . . . or arraigned on charges." (Emphasis in

*Wallace*).  Malicious prosecution, on the other hand, is an "'entirely distinct' tort, and it "remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process.[1]"  *Id.* (emphasis in *Wallace*) (citation omitted).

Accordingly, the Court determined that Wallace's § 1983 claim for false imprisonment accrued on the date that he was arraigned by a magistrate judge.  As such, his unlawful arrest claim was time-barred.  *Id.* at 392.

As in *Wallace*, Shaw alleges that he was arrested without probable cause on October 11, 2011, and convicted in 2013 as a result of the unlawful arrest.  Therefore, as the Officer Defendants contend, plaintiff's false arrest claim "accrued no later than 2013 – and most likely in 2011 when he would have been brought before a magistrate subsequent to his arrest."  ECF 40-2 at 12.  Yet, plaintiff did not file the instant suit until March 16, 2018, well more than three years after the accrual date, *i.e.*, the initiation of criminal proceedings.  *Id.*

Shaw counters that limitations began to run when his "false imprisonment" ended on January 20, 2016, *i.e.*, the date he was released from prison.  In support of this claim, plaintiff cites *Prince George's County v. Longtin*, 419 Md. 450, 457, 19 A.3d 859, 863 (2011).

In that case, the Maryland Court of Appeals articulated the "release date" rule: "The general rule for false arrest and imprisonment cases in which a person is *arrested and released prior to trial* is that 'the statute begins to run only when the imprisonment ends, since the period of imprisonment is treated as a unit.'"  *Longtin*, 419 Md. at 476, 19 A.3d at 874-75 (citation omitted) (emphasis added).  However, the *Longtin* Court emphasized that the release date rule is inapplicable to "cases in which the plaintiff's imprisonment continues from the arrest to trial and beyond."  *Id.* at 477, 19 A.3d at 875.  In such cases, "courts have commenced the statute of limitations at the formal start of criminal proceedings."  *Id.* (citing *Wallace*, 549 U.S. at 390-92)

(stating that the statute of limitations for false imprisonment claim "commenced to run when [plaintiff] appeared before the examining magistrate and was bound over for trial" and not when the plaintiff was released five years later, after his conviction was overturned on appeal).

The "release date" rule articulated in *Longtin* is inapplicable here, because Shaw was not released prior to trial. Rather, plaintiff alleges that he was arrested on October 11, 2011, and remained incarcerated until January 20, 2016. Therefore, as in *Wallace*, limitations began to run when criminal proceedings were initiated against Shaw. The Complaint does not specify the date on which plaintiff initially appeared before a magistrate, but his claim clearly would have accrued by 2013, when plaintiff appealed his convictions. Accordingly, plaintiff's false arrest claim against the Officer Defendants was untimely filed.[10]

In addition, the Officer Defendants contend that plaintiff's excessive force claim is time-barred "because it would have accrued in 2011, seven years before the filing of this present lawsuit." ECF 40-2 at 13. In support, the Officer Defendants rely on *Barnhill v. Strong*, JFM-07-1678, 2008 WL 544835, at *6 (D. Md. Feb 25, 2008).

In *Barnhill*, the plaintiff alleged, *inter alia*, claims of unlawful search, seizure, and excessive force under § 1983 against Maryland State Troopers. *Id.* Relying on *Wallace*, 549 U.S. at 390, Judge Motz determined that such claims were "analogous to the common law torts of false arrest and imprisonment" and "the statute of limitations on such claims beg[an] to run at the time the legal process [was] initiated." *Id.* He dismissed plaintiff's unlawful search, seizure, and

_____

[10] In contrast, "Under the common law, the limitations period for a plaintiff's prosecution claim commences when the proceedings brought against him are resolved in his favor." *Owens*, 767 F.3d at 390.

excessive force claims as untimely because the plaintiff filed suit more than three years after the initiation of the legal process. *Id.*

As discussed above, the use of excessive force would have occurred in 2011, and certainly no later than 2013. But, plaintiff did not file suit until more than three years later in 2018. Therefore, any excessive force claim would be time-barred.

In any event, plaintiff has failed to set forth facts that state a claim for use of *excessive* force. To be sure, there may be some force inherent in an arrest. But, such force is not automatically excessive under § 1983.

### 2. State Law Claims (Counts Two through Seven)

Plaintiff's remaining claims against the Officer Defendants are predicated on State law. In Counts Two through Seven, plaintiff alleges violations of the Maryland Declaration of Rights, negligence, negligent hiring and training, intentional infliction of emotional distress, and malicious prosecution. ECF 1, ¶¶ 64-115. As indicated, the malicious prosecution claim was timely filed, because, under the common law, limitations commenced no sooner than March 19, 2015, when the Maryland Court of Special Appeals ruled in Shaw's favor.[11]

As to Court One, jurisdiction is founded on the basis of a federal question, under 28 U.S.C. § 1331. ECF 1, ¶ 16. And, I have determined that dismissal of Count One is appropriate. Section 1367 of 28 U.S.C. governs supplemental jurisdiction over the plaintiff's remaining State law claims.

"[T]he doctrine of supplemental jurisdiction . . . 'is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in a manner that most sensibly

---

[11] I need not decide if limitations began on the date the Court of Special Appeals issued its decision or its mandate, or the date on which the Maryland Court of Appeals denied certiorari.

accommodates a range of concerns and values.'" *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 203 (4th Cir. 1997) (citation omitted). In *ESAB Group, Inc. v. Zurich Ins. PLC,* 685 F.3d 376 (2012), the Fourth Circuit described the traditional approach to supplemental jurisdiction (previously known as "pendent" jurisdiction). It said, *id.* at 394 (internal citation omitted):

> [S]o long as one claim in an action presented a federal question on the face of the well-pleaded complaint, a court could exercise jurisdiction over the entire constitutional case or controversy. It does not follow, however, that the federal court had original jurisdiction over the entire case; rather, it had original jurisdiction over at least one claim, allowing the exercise of supplemental/pendent jurisdiction over the remaining claims. And the Supreme Court subsequently recognized that, when the exercise of pendent jurisdiction over these claims became "inappropriate," district courts had inherent authority to remand them to state courts.

Pursuant to § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." In *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995), the Fourth Circuit recognized that under § 1367(c)(3), "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished." *See also ESAB Grp.*, 685 F.3d at 394 ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including . . . where the court dismisses the claims over which it has original jurisdiction."); *Hinson v. Norwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 616 (4th Cir. 2001) (stating that, "under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met"). *See also*, *e.g.*, *Ramsay v. Sawyer Prop. Mgmt. of Md., LLC*, 948 F. Supp. 2d 525, 537 (D. Md. 2013); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 500 (D. Md. 2005) ("Because the court will dismiss the

claims over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over the remaining state law claims.").

In the absence of any federal claims, I will exercise my discretion and decline to exercise supplemental jurisdiction over the remaining claims lodged under Maryland law. Therefore, the claims under Maryland law shall be dismissed, without prejudice.[12]

## IV.    Conclusion

For the foregoing reasons, I shall GRANT the Officer Motion (ECF 40), the BPD Motion (ECF 41), the City Motion (ECF 42), and the State Motion (ECF 43).

An Order follows.


Date:   September 16, 2019                                        _____/s/_____
                                                                 Ellen Lipton Hollander
                                                                 United States District Judge

---

[12] Plaintiff is cautioned that, under 28 U.S.C. § 1367(d), State law claims brought in federal court under supplemental jurisdiction that are dismissed "shall be tolled" while the claim is pending and for a period of 30 days after it is dismissed. In *Turner v. Kight*, 406 Md. 167, 189, 957 A.3d 984, 997-98 (2008), the Maryland Court of Appeals observed that § 1367(d) "serves to suspend the running of a State statute of limitations from the time the State-law claim is filed in U.S. District Court until 30 days after (1) a final judgment is entered by the U.S. District Court dismissing the pendant State-law claims, or (2) if an appeal is noted from that judgment, issuance of an order of the U.S. Court of Appeals dismissing the appeal or a mandate affirming the dismissal of those claims by the District Court."